Good morning, Your Honors. Alan Tippey of Solmeyer Cupid Superior on behalf of the appellate. Your Honor, I think I heard your comment about the fact that it may not take 30 minutes. I think a lot of this is set forth in the brief and probably trying to rehash it is completely unnecessary. What I was trying to do as I go through this, because I've talked about this case, frankly, with many scholars and different parties about the concepts and what the statute says and the policies that not only support it but also policies that appear to oppose it. In my own mind, I've been trying to walk through and try to make sense of all of it, and obviously there are a number of policies that seem to abut and confront one another. The appellees, of course, argue that the primary and overriding principle is this honest but unfortunate debtor should be the only ones that receive a discharge in a bankruptcy. We know that the statutes and the bankruptcy code doesn't so provide that. For example, and we pointed out in our brief, there are circumstances where a party who may have actually committed fraud but it wasn't relied upon by the creditor that extended credit will not essentially have a right to a non-dischargeability of a debt. Chapter 13 in its entirety is another example where fraud is a dischargeable claim provided the debtor complies with its plan. Justifiable reliance, reasonable reliance, all requirements of those kind of sections. Well, the statute itself seems, I mean, it does have somewhat of an internal inconsistency because of the fact that under 2AB1234, each of the other three conditions are clearly at the time that the money is lent or the lease is entered into. And then condition number three says on which the creditor to whom the debtor is liable, and it does, it is somewhat inconsistent with the timing requirements of the other three conditions for non-dischargeability. So because of that, I think we do have to look at the policies that undergird the whole bankruptcy code. If we're going to do that, and forgive me if I'm interrupting, I mean, there are other policy considerations that the bankruptcy code also promotes. One is that debtors are entitled to a fresh start. Of course, the counterargument, honest debtors. Again, that's not true. If you look at the bankruptcy code in its entirety, it allows dishonest debtors to get discharges under certain circumstances. It allows parties to discharge taxes under some circumstances but not under others, for example, merely because of the passage of time. So there are circumstances that the Congress has specifically drafted in the code sections to indicate when a party is entitled to a discharge and when it isn't. Now, the other policies that seem to be adopted by courts such as Meyer, and in this case the Bankruptcy Appellate Panel, is that they continue to fall back on this concept of assignability. Well, Frank, I'm not even aware of the concept of assignability of a non-dischargeability claim. They don't exist at the time of these assignability claims. Logistically, I think your argument entirely hinges upon the use of the word is in B-triple-I. Is that right? If it said was, you wouldn't be here. I think that's certainly the focus of attention. And if it said was, you wouldn't be here. I would probably have it drafted differently. Instead of saying to whom the debt is owed or to whom the debtor is liable, I would have merely said that reasonable reliance must be by the party that extended the credit or advanced the money or otherwise gave benefits to the debtor. The problem is the word is. I think the problem is the word is, but I think, again, as we sit here and you say, why would that be in this code section? But what I'm after is B-I, the same section, that is materially false. We have the same word is, but is applies to when the statement was made, and you're not arguing that if the statement has later become true or was false only then, that that gets you out from under. First of all, I disagree with the idea that all of this relates to the instance in which the original transaction occurred. For example, renewals. I understand that that's your position, but I'm trying to figure out how we're supposed to understand the same word is in B-I and in B-triple-I. It seems to me that B-I, the word is, talks about what happened at the time the credit was extended, even though the word is is used and even though the enforcement or the attempt to discharge may be some years later. Again, what I was trying to say is I don't agree that all of the other subsections relate to the analysis as conducted when the original loan was extended because, for example, if a debtor renews or receives an extension of maturity and the debtor is then asked to reaffirm that same financial statement, may it be one month later, six months later, a year or thereafter, you have essentially a new intent to deceive, you have a new misrepresentation, so that document, again, doesn't necessarily have to be one that arises in connection with the original transaction. Okay. That sounds like a different circumstance entirely. And it very well might be. There might be a complete new fraud under those circumstances. Now, again, if I can, because of... Let me raise something that's kind of troubled me. This particular provision Congress enacted in 1978. Correct. Okay. In 1978, we did not, in our financial markets, have the existence of all these bundling of loans or lease or debt which were bundled and sold to a new holder and sold again to a new holder and sold again to a new holder so that allegedly the risk of that debt would be diversified over a large number of people so as to minimize the risk. That wasn't a phenomenon that actually was in existence. And so what Congress had in mind, Congress had in mind that the person at the time of the default would be the same person as the person who gave the credit and not all of these assignments. And doesn't that explain why the whole thing is at the present time? And shouldn't we be interpreting this, you know, in a practical sense of how these loans ultimately were handled later? And, again, that's what I was trying to do is I was trying to understand it. Because if you look at the legislative history, it doesn't help you. To explain the reason why from Section 17 of the former Act, there's new language placed in the Bankruptcy Reform Act of 1978, but it's been on the books for 30 years and it's never been changed. Now you say it's never been changed because it's been clear. Well, it wasn't until, I guess, the Bowie decision there was a clear statement as to what exactly this statute was intended to mean. Now you say, how does this come into play? What if, for example, there was a financial statement given at a particular time, pick a date, 2000, and the creditor that received it didn't rely on it because in one instance, and frankly I have a case in front of another bankruptcy judge, the creditor says, oh, I was relying on the statement, I was relying on the fact that he was a doctor and he was earning income and he was a very good customer of the bank, et cetera. Now somebody comes along and buys that debt, looks in the file, sees a financial statement, it's still fresh. Namely, it's not a stale financial statement. It would otherwise make it not reasonable to rely on it. Now they buy that debt. According to the decision of the BAP in this case, that creditor would not be able to argue or present a case for non-dischargeability because the original creditor didn't rely. That to me seems completely unfair under those circumstances. Why did Congress put this in here? Well, I think the difference is between subsection A and B is that A, there aren't written documents in the file that a third party can look to in order to determine whether or not there was some misrepresentation. The fraud may have been committed by a conversation that was had between a loan officer and the borrower. Those kind of things in the file cannot be ascertained and, therefore, suggesting that that third party must have relied on a representation or misrepresentation that was not in a document that could be reviewed is completely understandable. That's why the assignment of the claim, as recognized by the Meyer report, makes sense. In this case, you have something in the file. You have a document. But the practical reality of all of these derivative transactions is that you buy a group of them and the business, you know, the next holder doesn't necessarily even get the files. They're relying on the word of the original creditor who presumably acted in reliance on the original statements and made a judgment to give the loan or enter into the lease. If you're going to act in purchasing assets and paying substantial amounts of money on a presumption, I think that's a risk that you take. You shouldn't presume. You should do your due diligence. I think that's what these cases say. You must do something in order to be able to rely on it. You cannot take this claim not knowing whether or not somebody else relied on it and then presume that you should be able to initiate non-dischargeability litigations. I say the concept of assignment that attempts to trump the concept of dischargeability, where the concept is in other cases, including by this own court, says that dischargeability provisions are to be strictly construed in favor of the debtor. This statute is not unclear. I know that Your Honor says that we're relying on the words is. Now, obviously, there are other words there as well, but is, yes. Why is it there? Are we presuming that Congress doesn't know how to use a present tense and a past tense, that they don't know how to draft? I don't presume that. I presume they did this for a reason. And the other concept, again, that overrides all this is where statute is unambiguous. We don't try to rewrite it or try to come up with concepts. Is there a difference between a true assignment, I don't know if this is a true assignment, and the situation that Judge Wardlaw was describing to you? And I'm sorry. Judge Wardlaw was talking about how in today, you know, the financial meltdown, all these investment banks buy up all this paper in a big batch without, you know, it's bundled up as an investment certificate, I guess. And then some bank buys it en masse. Is that different than an assignment? Well, I mean, it's only different, I think, in magnitude. I think it is, in essence, an assignment of rights under a contract. Now, again, we don't Those are going to be different kinds of assignments, correct? Of course. There are probably thousands of different types of assignments. I mean, just because of the nature of what it is. But an assignment, by its nature, when I was in law school many years ago, my contract professor said, you know, two words are differently, they mean two different things. Well, if we're talking about assignment, I have to presume an assignment is an assignment is an assignment. Well, let's talk about the assignment here. New Falls was assigned, quote, all right, title, and interest in the epic lease. Now, why doesn't that language include the right to non-dischargeability of the debt if it was obtained fraudulently in the first place and the original creditor would have the right to have it be non-dischargeable? Well, a couple of things. First of all, I don't think I need to belabor the point that we believe that there is no fraud here and if we ever have to try that case to show that. We're presuming that it is for purposes of our argument. I think the answer is because the concept of assigning a non-dischargeability claim, I believe, is anathema to the concept that dischargeability doesn't exist until bankruptcy cases commence. And if you want to say, well, the claim is an incohate claim that will arise upon the filing of a bankruptcy by the borrower. This is a broad assignment, all right, title, and interest. Well, again. And it's, you know, unlimited by time. Again, I think what we're trying to do is move assignments above dischargeability. Dischargeability is uniquely an act of Congress under the bankruptcy provisions of our Constitution. Congress can theoretically enact whatever provisions it wants to to either grant discharges or deny discharges. The idea that assignment under state law somehow overrides the limitations that may be placed upon discharges and dischargeability by Congress, frankly, I just think is a mistaken approach. I think the other thing that you have to recognize is if you believe that there was an assignment of a claim, the assignment of a right to deny dischargeability is still bound by the provisions that existed. From 1978 until the present day, that limitation under subsection 523A2BIII was there then, is here now. And if you take an assignment, you have to take it subject to the laws that exist at the time of the assignment. That restriction and limitation was there. Let me ask you one last question. Yes. So the bankruptcy appellate panel published their opinion. Yes. What would, you know, what would be the one case or maybe two cases that you would say you'd want us to look at because you believe that they would support your position? Well, if you ask about cases that may be relevant to this particular issue. I want to know if there's any cases out there that seriously undermine what the BAP did here. Well, where it seriously undermined is just the language of the statute. No, no, no. I'm asking are there any cases. Well, again, I can't say that a bankruptcy court decision should necessarily be adopted or followed by the BAP. No, I'm not asking. That's not my question. I'm asking you, judge, you must read these two cases because they will point you in the direction and explain to you why the BAP opinion is dead wrong. Well, first of all, I think the Field case is a United States Supreme Court decision. It does describe the differences between subsections A and subsections B. I think it's important. The BAP sort of didn't think that it was really that relevant because it related to other kind of things, and I understand the distinction between them. I do think the three cases that followed it, the Bowie, I think it was the Hurley and the White, I don't remember the full name of the case, the three decisions that followed it, did attempt to go through the process and analyze the statute as it was written. Okay. I do believe that this Court will, frankly, if you write an opinion, will write an opinion that everybody understands because there have been mistakes, including by the Bowie Court, because that Court said there must be reliance by every assignee along the line. I don't think that's what the statute says either, so I don't necessarily agree with that. I don't agree with that decision in that regard. But I do think it read it correctly as it respects the party to whom the debt is currently liable. All right. Thank you, counsel. Thank you. May it please the Court, Janine Del Monte Cole on behalf of New Falls. Respondent finds it peculiar that appellants repeatedly argue that the bankruptcy codes and policies and ideals should not be at all considered when examining the statutes of that code. Counsel would have us focus on one word, which is the word is, and from that word generate an ideal and policy that should be derived from 523A2B. We argue that the Court should look at Kmart v. Cartier, Crandon v. Boeing, which stand for the philosophy that in advocating the plain language of a statute, you do not only look at specific words or that only specific statute. You look at the policies and design of the code as a whole. You look at its objectives. And in this case, as has been repeated by numerous case law, that the objective of the bankruptcy code is to, yes, allow the honest but unfortunate debtor a fresh start. It is not to allow debtors to hide under the bankruptcy code from fraudulent acts that they have committed. With regard to the statute being clear in its face, New Falls agrees. We believe that the statute as written is very clear. A debt that is incurred from a creditor through fraud is simply not entitled to be discharged. How do you respond to the argument not presented in this case, but in the next case, assuming we go your way, where there was a statement that was untrue in the original application for the loan. The loan was made, however, not in reliance upon that statement. So it wouldn't qualify here as non-dischargeable because it was not relied upon. That loan is then assigned. The assignee reads the documents and does, in fact, rely on the incorrect statement. Now I'll call it fraudulent because there's some reliance upon it. Is there dischargeability or not dischargeability when the original lender did not rely on the untrue statement? It would not be dischargeable, and I don't find a problem with that. What the code is trying to do is trying to restrict fraud being the engine for which credit is incurred. And in that particular instance, there is no competing interest. The code is still – But how about the – I'm looking at the text of the statute. I mean, you know, that's where we're supposed to start and maybe where we're supposed to finish up. And your argument is that is applies to the misrepresentation at the time to the original lender and that that misrepresentation makes it forever non-dischargeable, whatever the assignment. But you're now saying is applies to a later reliance. No, I'm saying it does not apply to a later reliance. I'm saying that you're correct if there is no reliance by the creditor upon a fraudulent act and credit is extended, that even if that debt is assigned, the subsequent assignee does not have a right to seek a non-dischargeable payment. Oh, I didn't understand your answer. That is to say even if the subsequent assignee then looking at the case file does rely on the untrue statement, that nonetheless is not a fraudulent statement for purposes of non-dischargeability? That's your argument? I agree. I would agree with that. So you're, in essence, arguing a theory that each subsequent assignee steps into the shoes of the original creditor for better or for worse. That's exactly correct. I think that the very strong California policy favoring assignments is very clear. The assignee almost, in essence, becomes the original party. And so that's absolutely correct. In fact, if the original party did not have a right, then the assignee does not have a right. On the flip side, if the original creditor, in this case Epic Funding, had a right to pursue a non-dischargeability claim, then so does each of its assignees because they inherited all rights and interests into that specific claim. I mean, that's a nice, tidy intellectual argument, but it doesn't fit in a way with your original sort of policy-based argument, which is to say that honest but unfortunate debtors get discharged, defrauding debtors do not. Well, it sounds as though the debtor in this example made a statement that was intended to mislead. It just didn't happen to do so as to the original lender. It does do so as to the second. Well, that sounds to me like that's not an honest but unfortunate debtor. That's a dishonest debtor. But you're saying that person is nonetheless discharged. That's correct. I think that there are... So the original policy that the bankruptcy protects only honest but unfortunate is not quite right. No. I think that there are multiple... I think this is what appellants get hung up on. There are multiple policies with regard to the bankruptcy code. For example, simply looking at the old accent, it's better that 100 guilty men go free than one innocent man stay in jail. Now, the policy is clearly that we want to protect the one innocent person. That does not mean as a policy we want 100 guilty men going free. Well, same as the bankruptcy code. I mean, there is a policy that upon the procurement of credit, that should not be done by fraudulent means. And so this statute was directed only to that. Now, in the case that you're presenting, if the AFSCME relied upon fraudulent statements, I think that's unfortunate. I think that that is a problem. Do I think that this code necessarily attaches to that? No, I don't. I think that what this code is looking to is the procurement of debt. And under your circumstance, unfortunately, that particular debtor is not required to be discharged. That claim is not required to be discharged. I don't think they're competing. Okay. Your client may be in a situation to regret your argument in a later case. Let's say your client purchases debt. And so now they read the file and they see something they rely on. It turns out, well, the first person didn't rely on it, even though fraudulent. You've just said, oh, no cause of action. It is dischargeable. I strongly believe that the assignment, the right of assignment is a very clear and a very strong policy in California. And I think that what you get is simply what the original person had. Does all this turn on the text of the assignment, on the nature and substance of the rights that are assigned? Well, certainly I think an assignment that is limited to a specific property or a specific, when I say property, not specific tangible property, but a specific aspect of a claim, I think that that is obviously a driving factor in what the assignment is interpreted as. If the assignment is to all rights, all interests, all claims, I think that's a very specific type of assignment that entitles the assignee to exactly what it says, which is everything. Is that what we have here? Yes. That's what we have here. Thank you. With regards to another argument that the Court raised to appellant, I think it's also interesting that when the briefs were submitted in December of 2007, we stated to this Court that financial markets are really in need of protection from the commodities that they are receiving. And at that time it was impossible to foresee the fall of Bear Stearns and the fall of Lehman and these other predators. But what's interesting is that as the FDIC becomes a holder of all of this fraudulent activity, which wouldn't argue not all of it is fraudulent, but all of this debt, all of this commercial paper, I think it's very important and vital that this Court recognize that a lot of assignees are not necessarily by choice. And so the argument that every assignee is required to do due diligence and required to take on additional work to ensure that their right to protect it as assignees I think is a dangerous one. And I think it really devalues the commodities as they're currently being traded, because it's unfair for an assignee, after having acquired a good, to then ask to be to go back and do additional work to ensure that their rights are protected. Particularly the FDIC is the best example, which they have no control over their rights. And as taxpayers, we're now vested in the success of the FDIC and other governmental agencies collecting on these debts. Let me follow through with your argument. Let's assume that we have a debt that's incurred, and there may or may not have been fraud incurring the original debt. Then the creditor assigns to a third party. That creditor defrauds the third party, that is to say, in the assignment misrepresents the value of the debt in a fraudulent fashion. Now, does that make that non-dischargeable and is against whom? Well, if I understand your question, an assignee is again assigning a claim to another third party under fraudulent pretexts. Well, then, whatever they're assigning, if that's done by fraud, that assignee would certainly be liable to have their debt. If that assignee was to go bankrupt, it would certainly be liable under a non-dischargeability claim, because they are selling a commodity or an item and having that credit be procured by debt, by fraud. And that's simply not what the code allows for. It does not allow for the procurement of credit. But the original lender is no – they're out of the transaction. That would just be an ordinary fraudulent sale. Sure, absolutely. That's it. All right. Any further questions? All right. Thank you very much, Counsel. Go ahead. Go ahead. Revaluation v. New Falls Corporation is submitted, and we will take up Hassani v. McCasey.
judges: Wardlaw, Fletcher, Paez